## IN THE UNITED STATES FEDERAL DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| **NICHOLAS BRUNTS,** | ) | |
| *individually and on behalf of* | ) | **Case No. 22-CV-00648-HEA** |
| *all others similarly situated,* | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **v.** | ) | |
| | ) | |
| **HORNELL BREWING CO., INC., and** | ) | |
| **DOES 1 through 10,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff Nicholas Brunts, individually and on behalf of all others similarly-situated, hereby files this, his First Amended Class Action Complaint, against Defendant Hornell Brewing Co., and DOES 1 through 10 (collectively "Defendants") for their false, misleading, and deceptive marketing of their products, constituting breach of warranty, breach of implied contract, and unjust enrichment in the State of Missouri, in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. chap. 407 ("MMPA"), and also in violation of the similar consumer protection statutes in multiple states.

## I.    INTRODUCTION

1.    Defendant falsely labels and advertises certain of its AriZona beverage products as being "All Natural," when, in reality, they contain multiple ingredients that are *not* natural, including ascorbic acid, high fructose corn syrup, malic acid, erythritol, and added coloring (including but not limited to "beta carotene," "fruit and vegetable juices," "annatto," and "vegetable juice"). The purportedly "All Natural" AriZona beverages are collectively referred to herein as the "Products".[1]

---

[1] The term "Products" encompasses Defendant's AriZona Kiwi Strawberry Fruit Juice Cocktail, Lemonade Fruit Juice Cocktail, Mucho Mango Fruit Juice Cocktail, Fruit Punch Fruit Juice Cocktail, Watermelon Fruit Juice Cocktail; Orangeade, Grapeade, Lemonade Drink Mix, Golden Bear Strawberry

2.      The prominent label "ALL NATURAL, 100% NATURAL," or "100% ALL NATURAL" is depicted on the front of each Products' container, and serves to mislead consumers into believing the Products are entirely natural when they are in fact not.

3.      Plaintiff brings this First Amended Class Action Complaint individually and on behalf of a putative class of Missouri residents, and a putative class of residents from particular states, as set forth *infra,* the "Consumer Protection Subclass."

4.      Plaintiff brings this class action against Defendant, who is among the United States' leading producers of beverage products. Defendant has realized that, based on the public's concern about natural and healthy foods, there is a financial benefit to be derived in selling products claiming to be natural. Accordingly, Defendant deceptively labels the Products as "All Natural," even though the Products contain various unnatural ingredients, all in violation of Missouri and the various other states' laws.

5.      Pursuant to the MMPA and those other states' laws, such practice is illegal.

6.      In addition to and/or in the alternative to the above, since the initial offering of the Products, each and every container of the Products has borne a uniformly-worded label falsely claiming the Product is "ALL NATURAL" and/or "100% NATURAL."  That uniformly-worded false statement gives rise to additional and/or alternative claims under Missouri law, and the laws of certain other states.

## II.      PARTIES, JURISDICTION, AND VENUE

7.      Plaintiff Nicholas Brunts is a citizen and resident of St. Louis County, Missouri.

8.      Plaintiff brings this Class Action Complaint individually and on behalf of a putative class of Missouri residents, and/or a putative subclass of consumers from certain states, the "Consumer Protection Subclass."

---

Lemonade, Iced Tea Lemonade, Diet Peach Iced Tea, and Rx Energy Herbal Tonic product. *See* photos of Products, *infra.*

9.      Defendant Hornell Brewing Co., ("Hornell") is a New York Corporation that has its principal place of business at 60 Crossways Drive W., St. 400, Woodbury, New York 11797.

10.     Defendant Hornell, directly and through its agents, has substantial contacts with and receives substantial benefits and income from and through the State of Missouri.  Hornell is the owner, manufacturer, and distributor of the Products, and is the company that created and/or authorized the false, misleading, and deceptive packaging of the Products.

11.     The true names and capacities of the Defendants sued herein as DOES 1 through 10, inclusive, are currently unknown to Plaintiff, who therefore sues such Defendants by fictitious names. Each of the Defendants designated herein as a DOE is legally responsible for the unlawful acts alleged herein.  If necessary, Plaintiff will seek leave of Court to amend the Petition to reflect the true names and capacities of the DOE Defendants when such identities become known.

12.     Venue is proper in this Court because Plaintiff was injured in this venue and lives within this venue.

13.     This asserted class action comports with Missouri Supreme Court Rule 52.08 and with R.S.Mo. § 407.025(3) of the MMPA.  Plaintiffs' identities can be ascertained from Defendant's records, but are so numerous that simple joinder of all individuals is impracticable.  This action raises questions of law and fact common among Plaintiffs.  The claims of lead Plaintiff is typical of all Plaintiffs' claims. Named Plaintiff will fairly and adequately protect all Plaintiffs' interests, and is represented by attorneys qualified to pursue this action. More specifically:

14.     Class definitions:  Plaintiff Nicholas Brunts brings this action on behalf of himself and a class of similarly-situated persons preliminarily-[2]defined as follows: All persons who purchased the

---

[2] Plaintiff reserves the right to propose, as needed, any different or other more- or less-specific class, classes, subclass, or subclasses as Plaintiff deems appropriate for purposes of class certification. Included within this reservation is a potential subclass of those citizens in those states having consumer protection laws materially-similar to the MMPA: Illinois, Maryland, Hawaii, New York, Washington

Products[3] during the Class Period while in one of the specific states having consumer protection statutes materially-identical to the MMPA: Illinois, Maryland, Hawaii, New York, Washington D.C., Rhode Island, Vermont, Washington, and Connecticut ("Consumer Protection States").  In addition, and/or alternatively, Plaintiff brings this action on behalf of himself and a Missouri subclass of similarly-situated persons defined as follows: All persons, who, within the Class Period, purchased the Products in the State of Missouri.  The Class Period begins five years prior to the date of the filing of this Amended Complaint, and ceases upon the date of the filing of this Amended Complaint. Excluded from the Class and Subclass are: (a) any judges presiding over this action and members of their staffs and families; (b) the Defendants and their subsidiaries, parents, successors, and predecessors; any entity in which the Defendants or their parents have a controlling interest; and the Defendants' current or former officers and directors; (c) employees (i) who have or had a managerial responsibility on behalf of the organization, (ii) whose act or omission in connection with this matter may be imputed to the organization for liability purposes, or (iii) whose statements may constitute an admission on the part of the Defendants; (d) persons who properly execute and file a timely request for exclusion from the class; (e) the attorneys working on the Plaintiffs' claims; (f) the legal representatives, successors, or assigns of any such excluded persons; and (g) any individual who assisted or supported the wrongful acts delineated herein.

15.    <u>Numerosity</u>:  Upon information and belief, the Class and Subclass includes at least tens-of-thousands of individuals on a multiple-state basis, making their individual joinder impracticable. Although the exact number of Class members and their addresses are presently unknown to Plaintiff, they are ascertainable from Defendants' records.

---

D.C., Rhode Island, Vermont, Washington, and Connecticut ("Consumer Protection Subclass").  Each state therein has a consumer protection statute that broadly prohibits deceptive conduct; likewise, no state requires proof of individualized reliance, or proof of Defendant's knowledge or intent. Thus, Defendant's conduct alleged herein violates each statute's shared prohibitions.

[3] As that term and label is defined herein.

16.     <u>Typicality</u>: Plaintiff's claims are typical of those of the Class and Subclasses because all Plaintiffs were injured by the Defendants' uniform wrongful conduct, specifically, using misleading and deceptive marketing and advertising in offering and selling the Products to Plaintiffs.

17.     <u>Adequacy</u>:  Plaintiff Brunts is an adequate representative of the Class and Subclasses because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained competent and experienced counsel, and he intends to prosecute this action vigorously.  The interests of the Class will be protected fairly and adequately by Plaintiff and his counsel.

18.     <u>Commonality</u>:  Common questions of law and fact exist as to all Class members and predominate over any questions affecting only individual members, such as: (a) whether the Defendant used deceptive or misleading marketing and advertising in selling the Products; (b) whether and to what extent the Class members were injured by Defendant's illegal conduct; (c) whether the Class members are entitled to compensatory damages; (d) whether the Class members are entitled to declaratory relief; and (e) whether the Class members are entitled to injunctive relief.

19.     <u>Superiority</u>:  This class action is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy.  The damages suffered by the individual Class members will likely be small relative to the burden and expense of individual prosecution of the complex litigation necessitated by the Defendant's wrongful conduct.  Thus, it would be extremely difficult for the individual Class members to obtain effective relief.  A class action presents far fewer management difficulties and provides the benefits of a single adjudication, including economies of time, effort, and expense, and uniformity of decisions.

### III.     <u>BACKGROUND</u>

20.     Defendant Hornell manufactures, distributes, and/or sells the "Products" – AriZona beverage products, including but not limited to, AriZona Kiwi Strawberry Fruit Juice Cocktail, Lemonade Fruit Juice Cocktail, Mucho Mango Fruit Juice Cocktail, Fruit Punch Fruit Juice Cocktail,

Watermelon Fruit Juice Cocktail; Orangeade, Grapeade, Lemonade Drink Mix, Golden Bear Strawberry Lemonade, Iced Tea Lemonade, Diet Peach Iced Tea, and Rx Energy Herbal Tonic product, all of which Defendant labels as being "All Natural" and/or "100 Natural."

21.    Examples of the Products' packaging are as follows:

  

a.

  



22.     As shown, the Products, regardless of flavor or color of packaging, uniformly claim to be "ALL NATURAL." (magnified label examples, *infra*):



a.

b.

23.     The "ALL NATURAL" label is a key selling point for the Products.

24.     Up to 70% of consumers say they're willing to pay a premium for food products in the natural, ethical, enhanced or "less of…" categories.[4]  Other studies show that consumers are willing to pay more for all natural products because of the association with a healthy and organic diet, with as high as 88% of Americans reporting they are willing to pay more for healthier foods.[5]

---

[4] See Consumer Health Claims 3.0 The Next Generation of Mindful Food Consumption, available at https://www.lek.com/insights/ei/next-generation-mindful-food-consumption (last visited April 18, 2022).
[5] *See* Global Health and Wellness Report 2015, NIELSON,

7

25.     By representing the Products to be "All Natural," Defendant is capitalizing on consumers' preference for food items with no artificial additives.

26.     In reality, however, the Products cannot be labeled as "All Natural" because they contain multiple unnatural ingredients, including ascorbic acid, high fructose corn syrup, malic acid, erythritol, and added coloring (including but not limited to "beta carotene," "fruit and vegetable juices," "annatto," and "vegetable juice").

27.     The average consumer spends less than 20 second making any individual in-store purchasing decision.[6]  That decision hinges almost entirely on the product's front labeling because the average consumer does not have the time – while presumably on a schedule and surrounded by multiple other consumers – to inspect the small font on the rear of a Product to determine whether it tends to support and/or refute a prominent claim, such as "All Natural," on the front of the Product.

28.     Based on the "All Natural" and/or "100% Natural" claims on the front of the Product, a reasonable consumer would believe that the Product contains only "natural" ingredients.  Likewise, consumers assume that a "natural" product will not contain any preservatives.  This is true despite what ingredients may be listed on the back-side small-print of a product. Consumers' ability to interpret nutrition label information on the back of products is relatively poor; thus, the prominent labels typically featured on the front packaging are particularly important to a consumer's purchasing decision.[7]

---

https://www.nielsen.com/wp-content/uploads/sites/3/2019/04/Nielsen20Global20Health20and20Wellness20Report20-20January202015-1.pdf (last visited April 18, 2022).

[6] Randall Beard, *Make the Most of Your Brand's 20-Second Window*, NIELSEN (Jan. 13, 2015), https://www.nielsen.com/us/en/insights/article/2015/make-the-most-of-your-brands-20-second-window/ (citing *Shopping Takes Only Seconds… In-Store and Online*, EHRENBERG-BASS INSTITUTE OF MARKETING SCIENCE (2015)) (last visited August 24, 2022).

[7] See Lisa M. Soederberg Miller and Diana L. Cassady, *The Effects of Nutrition Knowledge of Food Label Use: A Review of the Literature,* 92 APPETITE 207 (2015); A B Marietta, et al., *Knowledge, Attitudes, and Behaviors of College Students Regarding the 1990 Nutrition Labeling Education Act Food Labels,* 99 J. Am. Diet Ass'n 445 (1999).

29.     Consequently, Defendants' practice of capitalizing on consumers' preferences for healthier products by falsely labeling their Products "All Natural" and/or "100% Natural" is deceptive and misleading.  This deception continues today, as consumers continue to purchase the Products under the mistaken belief that they are all natural based on Defendant's false, deceptive, and misleading label claims of "All Natural" and/or "100% Natural."

30.     Plaintiff and other consumer of the Products made their purchase decisions in reliance upon Defendants' advertised claims that the Products are "All Natural."

31.     By falsely labeling the Products as being "All Natural," Defendant Hornell has profited from consumers' preference for food products that are perceived to be healthier and made free from any unnatural ingredients, preservatives, and/or added coloring.

### Defendant's False and Misleading "All Natural" Label Claim

32.     The "All Natural" and/or "100% Natural" claims are false because the Products contain multiple unnatural ingredients and/or preservative – either ascorbic acid, high fructose corn syrup, malic acid, or erythritol, *as well as* unnatural added coloring – including but not limited to "beta carotene," "fruit and vegetable juices," "annatto," and "vegetable juice."

33.     In addition to the above-listed unnatural ingredients and preservatives in the Products (discussed *infra*), the added coloring in each of the Products renders the "All Natural" claims false.  The Food and Drug Administration ("FDA") does not regard foods with added coloring as natural, no matter the source of the coloring agent. According to their guidelines, they "have considered 'natural' to mean that *nothing* artificial or synthetic (*including colors regardless of source*) is included in, or has been added to, the product that would not normally be expected to be there (56 FR 60421 at 60466)."[8]

---

[8] Leslie Kux, *FDA Rulemaking Re Term Natural,* 12 November 2015
https://www.federalregister.gov/documents/2015/11/12/2015-28779/use-of-the-term-natural-in-the-labeling-of-human-food-products-request-for-information-and-comments, (last visited April 1, 2022).

(emphasis added).

34.     In response to citizen petitions and consumer requests, the FDA recently announced the establishment of a docket to receive information and comments on the use of the term "natural" in the labeling of human food products to determine whether a definition of "natural" should be established.

35.     Among the 7,687 public comments received by the FDA, not one comment from the public stated that "natural" should be allowed in food labeling if color is added to a food; rather, hundreds of comments stated "natural" should only be used for foods which are free from added coloring.   In addition, multiple comments discussed the other various unnatural ingredients in the Products.  Some representative examples include:

    a.  "When I see the word 'Natural' on packaging, I expect the contents to have only ingredients as they are found in nature. No chemicals, no coloring, no flavoring, no GMO's." (Comment from Kristine Milochik. Posted 02/23/2016).

    b.  "I think the term 'Natural' should be banned from food labeling. It is too ambiguous! It should be removed from all descriptors, including: Natural Flavor, Natural colors, All Natural and so on. I think for the interest of transparency all food ingredients should be simply labeled. The consumer has the right to know what they are eating or drinking." (Comment from Daniel Kinkelaar. Posted 08/26/2016).

    c.  "I firmly believe that consumers should be made aware of what they are purchasing when shopping for food and too many times companies are fooling the public by using the word 'Natural' when in fact it is not. When I see the word Natural on a food product, I consider this to mean that it is free from all additives, GMOs, Preservatives, Drugs, or colors. It is in its natural state. I

would like to see the FDA put more stringent requirements on companies who wish to use this term in their products." (Comment from Artemis Hader. Posted on 02/18/2016)

d.  "The term 'Natural' should only appear on foods that are organic without any preservatives or man-made chemicals. The food should be GMO-free and contain no added colors, flavors, or synthetic substances. If a food product fails to meet any of these requirements, then it should not be allowed to have the label 'Natural' on it." (Comment from Sara Burr. Posted on 03/16/2016)

e.  "Natural should indeed mean no preservatives, additives, GMO's and or flavor or color enhancers…" (Comment from Roy Collicutt. Posted on 03/15/2016).

f.  "Natural should mean no added colors, flavoring, or preservatives, including citric acid. Natural should mean minimally processed and GMO free." (Comment from Catherine Willick. Posted on 02/16/2016).

g.  "Natural should be used only when no artificial/synthetic flavors or colorings or preservatives have been used. Natural should never be used for any product containing geneticall[y] engineered ingredients, including ascorbic acid, folic acid, or anything other GE mineral/supplementation. (Comment from Kathryn Mahony. Posted on 05/05/2015).

h.  "Ascorbic acid may or may not be natural, depending on the source and should be labeled that way." (Comment from James Scott. Posted on 12/16/2015).

i.  "Natural should mean no genetically modified ingredients, no hormones or antibiotics, no high fructose corn syrup, and no preservatives or additives. (Comment from Steven Malafy. Posted on 12/27/2015).

11

> j. "No highly processed/artificial sweeteners or sugar substitutes [such as] . . . erythritol." (Comment from Kristen Behrens. Posted on 10/18/2016).
>
> k. "Food additives Maltodextrin and Natural flavors are used to enhance and preserve the products' flavors and appearance. These two additives should not be considered natural because it alters the food changing it from its original state." (Comment from Absydee Molina. Posted on 10/26/2016).

36.    Clearly, reasonable consumers do not expect ingredients such as added colors, ascorbic acid, high fructose corn syrup, malic acid, erythritol or any of the various "natural flavors" to be present in products labeled "All Natural" or "100% Natural".

37.    Moreover, in that each of the Products contains at least one other unnatural ingredient and/or preservative *in addition to* the Product's "natural flavors," it can be fairly said that each Product contains multiple ingredients a reasonable consumer would not find to be "natural."

38.    To date, the FDA has not announced its decision to further define or regulate the term "natural" in food labeling.[9]

39.    The "All Natural" or "100% Natural" label is prominently and conspicuously printed on the front of the Products. However, the added coloring agents coloring agents (regardless of their source), ascorbic acid, high fructose corn syrup, malic acid, and erythritol, are not ingredients consumers would normally expect to be included in products that are labeled as "All Natural."  Consequently, those ingredients render the "All Natural" and "100% Natural" claims false, misleading and deceptive.

### The Coloring Additives Are Not "Natural" And Render the Products Un-Natural

40.    The FDA does not regard foods with added coloring as natural, no matter the source of the coloring agent.  According to their guidelines, they "have considered 'natural' to mean that nothing

---

[9] As Plaintiff clarifies repeatedly throughout this FAC, Plaintiff is *not* claiming the "natural flavors" label is deceptive.

artificial or synthetic (including colors regardless of source) is included in, or has been added to, the product that would not normally be expected to be there (56 FR 60421 at 60466)."[10]

41.    Thus, if a product contains any color additives (as do all the Products) it cannot be truthfully labeled as "natural."

42.    Furthermore, the process by which naturally-sourced food coloring is added to products alters their status, rendering them no longer "natural," but artificial and/or synthetic. The specific food coloring agents in the Products are "vegetable juice," "fruit and vegetable juices," "annatto," and "beta carotene."

43.    Annatto extract is extracted from the seeds of the *Bixa Orellana* tree.  The extraction process involves the use of solvents such as methanol, ethanol, 2-propanol, acetane, ethyle acetate, and hexane.[11]  Residues of these solvents remain present in the finished annatto extract product, and make their way into the foods and beverages that use annatto extract as ingredients.[12] This method of extraction, coupled with the residual solvents present in annatto extract, makes it an artificial and synthetic ingredient, and renders any "All Natural" or "100% Natural" claims false.

44.    Reasonable consumers would not expect annatto extract, a compound extracted with chemical solvents such as methanol and ethanol, to be present in foods and beverages labeled "All

---

[10] Leslie Kux, FDA Rulemaking Re Term Natural, Nov. 12, 2015. https://www.federalregister.gov/documents/2015/11/12/2015-28779/use-of-the-term-natural-in- the-labeling-of-human-food-products-request-for-information-and-comments (last visited August 24, 2022).

[11] *See* Yusai Ito, et. al., *Analysis of Residual Solvents in Annatto Extracts Using a Static Headspace Gas Chromatography Method,* 3 Am. J. of Analytical Chemistry, 638, 638 (2012); Claudia R. Cardarelli, et. al., *Characterization of Different Annatto Extracts Based On Antioxidant and Colour Properties,* 41 Food Science and Technology 1689 (2008).

[12] *See* Yusai Ito, et. al., *Analysis of Residual Solvents in Annatto Extracts Using a Static Headspace Gas Chromatography Method,* 3 Am. J. of Analytical Chemistry, 638, 638 (2012)("With the established HSGC method, six residual solvents (methanol, ethanol, 2-propanol, acetone, ethyl acetate, and hexane) in 23 commercial annatto-extract products that consist of seven bixin-based and 16 norbixin-based products were quantified.")

Natural" and/or "100% Natural."

45.     Likewise, beta carotene used for commercial purposes, such as food additives, is often chemically produced, rather than naturally harvested, to save costs.[13]  Beta carotene is synthesized using two main complex chemical processes, Wittig reactions and Grignard compounds.[14] It is hard to imagine anything more *unnatural* than a substance that must be artificially manufactured on an atomic level.[15]

46.     According to the most-recent scientific journals on the subject, such as *Frontiers in Bioengineering And Biotechnology,* approximately 98% of commercial beta carotene is synthesized.[16] Specifically, scientists report that "98% of all commercial ß-carotene was *produced* either using physiochemical synthesis or chemical synthesis, whilst the remaining 2% had biological origin."[17] (emphasis added).

47.     In light of the overwhelming probability (over 98%), and upon information and belief, the beta carotene in the Products is artificially synthesized, rather than being naturally harvested. This is made especially apparent by the relatively cheap price of some of the Products, which makes it even more likely that Defendants use synthesized beta carotene.[18]  Consequently, the presence of beta

---

[13] Ludmila Bogacz-Radomska and Joanna Harasym*, ß-Carotene—Properties and Production Methods,* 2 Food Quality and Safety 69, 70-071 (2018).

[14] *Id.* at 71 ("One strategy for obtaining carotenoids in the Wittig reaction is to combine two phosphonium salt molecules, each containing 15 carbon atoms, one dialdehyde molecule containing 10 carbon atoms.  Then the reaction products are subjected to an isomerization reaction resulting in symmetric compounds being formed of the 40 carbon atoms, including B-carotene, lycopene, or astaxanthin … To use Grignard compounds, it is necessary to combine one diketone molecule and two methanol molecules [so that] thereafter [a] compound containing 40 carbon atoms is obtained.")

[15] *Id.*

[16] Irene Hjorth Jacobsen, et al., *Recombinant B-Carotene Production by Yarrowia lipolytica – Assessing the Potential of Micro-Scale Fermentation Analysis in Cell Factory Design And Bioreaction Optimization,* Frontiers in Bioengineering and Biotechnology (Feb. 13, 2020), *available at*: https://www.frontiersin.org/articles/10.3389/fbioe.2020.00029/full#B23  (last visited Aug. 24, 2022)..

[17] *Id.*, citing Ribereiro, B.D., Barreto, D.W. and Coelho, M.A.Z. (2011) *Technological aspects of ß-carotene production.* Food Bioproc. Technol. 4, 693-701, *available at*: https://link.springer.com/article/10.1007/s11947-011-0545-3  (last visited Aug. 20, 2022).

[18] Even if Defendant *did* use un-synthesized beta carotene, the process for extracting it remains extremely artificial and renders the Product not "Natural."

carotene in the Products renders them unnatural.  There is nothing "natural" about ingredients that must be chemically synthesized in laboratory factories.

48.     Defendant misleadingly fails to state which particular "vegetable" and "fruit" juices are used for coloring; however, just as with beta carotene, the commercial extractions of these ingredients from vegetables and fruits makes these ingredients artificial and/or synthetic. These processed ingredients are added to the Products to change the composition of the product from its natural state, in an amount, type, and/or form which a reasonable consumer would not expect.  Indeed, as stated above, the FDA *specifically* and *expressly* does not recognize food that contains these ingredients as "natural," and neither do consumers.[19]  Reasonable consumers do not expect a product prominently labeled as "All Natural," and/or "100% Natural" to have added coloring, regardless of source, to alter the color of the Products.

### Ascorbic Acid Is Not "Natural" And Renders the Products Un-Natural

49.     According to producers and experts in synthesizing ascorbic acid, high production costs make it so that industrial ascorbic acid used as food additives are rarely, if ever, extracted from natural sources.[20]  Instead, ascorbic acid is mass produced for use in foods and beverages through a chemical process which involves hydrogenation, double fermentation, ion exchange, esterification, dissolving, decoloring, filtering, crystallization, centrifugation, vacuum drying, and sieving before the ascorbic acid is synthesized.[21]  In fact, commercial production of ascorbic acid involves a multi-step chemical and/or enyzmic synthesis.[22]  Moreover, ascorbic acid commonly used in commercial foods and beverages

---

[19] *See* Lux, *fn. 9,* supra: The FDA "have considered 'natural' to mean that *nothing* artificial or synthetic (*including colors regardless of source*) is included in, or has been added to, the product that would not normally be expected to be there." (56 FR 60421 at 60466)

[20] *Ascorbic Acid Journey: From Production to Applications,* Dolchem Quality Chemicals, available at: https://www.dolchem.com/blog/ascorbic-acid-journey-from-production-to-applications/  (last visited August 20, 2022).

[21] *Id.*

[22] *See* Gunter Pappenberger and Hans-Peter Hohmann, *Industrial Production of L-Ascorbic Acid*

typically comes from corn, and 90% of corn in the United States is genetically engineered.[23]  The final form of the commercial ascorbic acid is white powder that contains no traces of fruits or vegetables, and instead, is a synthesized compound that originally came from fruits/vegetables, after undergoing chemical processes.  This is not a "natural" ingredient for the Products.

50.    Upon information and belief, the ascorbic acid used by Defendant in the Products is not a naturally occurring ascorbic acid, but instead is synthesized by chemical processes.[24]

51.    Reasonable consumers would not expect synthetic ascorbic acid, manufactured from an extensive chemical process, to be present in foods and beverages labeled "All Natural" and/or "100% Natural."

### High Fructose Corn Syrup Is Not "Natural" And Renders the Products Un-Natural

52.    High fructose corn syrup is a synthetic compound "that is made from corn … using chemicals (caustic soda, hydrochloric acid) and enzymes (amylase and glucoamylase) to hydrolyze corn starch to corn syrup containing mostly glucose and a third enzyme (glucose isomerase) to isomerize glucose in corn syrup to fructose to yield HFCS products."[25]

53.    According to the FDA, high fructose corn syrup cannot be considered a natural ingredient because it undergoes fundamental chemical changes in the manufacturing process.[26]

54.    Reasonable consumers would not expect high fructose corn syrup, a synthetic compound

---

*(Vitamin C) and D-Isoascorbic Acid,* Advanced Biochemistry, Eng'G, and Biotechnology 143 (2014).
[23] Laura Dodson, *Recent Trends in GE Adoption,* U.S. Department of Agriculture (July 17, 2020), *available* at: https://www.ers.usda.gov/data-products/adoption-of-genetically-engineered-crops-in-the-us/recent-trends-in-ge-adoption.aspx/  (last visited August 10, 2022).
[24] Even if the ascorbic acid were un-synthesized, as was true with beta-carotene, the extraction process alone would render the ascorbic acid not "natural."  In other words, were they fully educated as to the source of ascorbic acid, no reasonable consumer would consider ascorbic acid, in any form, as "natural."
[25] Kay Parker, et. al., *High Fructose Corn Syrup: Production, Uses and Public Health Concerns,* 5 Biotechnology and Molecular Biology Rev. 71, 71 (2010).
[26] Lorraine Heller, HFCS is Not 'Natural,' Says FDA, BEVERAGEDAILY.COM (Apr. 1, 2008), *available at:* https://www.beveragedaily.com/Article/2008/04/02/HFCS-is-not-natural-says-FDA  (last visited August 22, 2022)

manufactured from an extensive chemical process, to be present in foods and beverages labeled "All Natural" and/or "100% Natural."

### Malic Acid Is Not "Natural" And Renders the Products Un-Natural

55.     Malic acid produced for industrial uses, such as the malic acid that is "widely used in the food industry … is generally obtained through chemical synthesis."[27]  Malic acid produced for use as a food additive is called DL-Malic Acid.  DL-Malic Acid is commercially produced in a few ways, including by the hydration of fumaric acid or maleic acid[28] and by "the catalytic oxidation of benzene to maleic acid, which is converted to Malic Acid by heating steam under pressure."[29]

56.     Upon information and belief, the malic acid present in the Products is chemically synthesized and artificial.

57.     The chemical synthesis of malic acid creates an artificial, not natural, ingredient which cannot be truthfully labeled as "natural."

58.     Reasonable consumers would not expect malic acid, a synthetic compound manufactured from an extensive chemical process, to be present in foods and beverages labeled "All Natural" and/or "100% Natural."

### Erythritol Is Not "Natural" And Renders the Products Un-Natural

59.     Erythritol is an artificial sweetener that is "generally crafted from GMO cornstarch and has been referred to as an "invisible GMO ingredient."  It is manufactured through a "multi-step process

---

[27] POLYNT GROUP, *Malic Acid for Food* , *available at*: https://www.polynt.com/malic-acid-in-food/ (last visited August 20, 2022); James Han, *What is Malic Acid in Food? Benefits, Uses, Safety, Side Effects,* (Jan. 19, 2020) foodadditives.net, *available at*: https://foodadditives.net/acidulents/malic-acid/ ("Malic acid sold in the market usually refers to its DL form …. [DL Malic Acid] does not occur naturally and according to the FDA, it can be commercially produced by hydration of fumaric acid or maleic acid.")(last visited August 24, 2022).
[28] *Id.*
[29] Monice Zondlo Fiume, et. al., *Final Report on the Safety Assessment of Malic Acid and Sodium Malate*, 20 Int'l J. of Toxicology, 47, 48 (June 15, 2000), *available at*: https://pubmed.ncbi.nlm.nih.gov/11358110/ (last visited August 24, 2022).

that starts with the fermentation of a pure culture of a non-toxic microorganism – *Moniliella pollinis* – that feeds on carbohydrate-based medium and ends with the purification of erythritol from the fermentation of broth.  The erythritol present in the Products is an artificial and synthetic ingredient.

60.    Erythritol is an artificial and synthetic compound which cannot truthfully be labeled as "natural."

61.    Reasonable consumers would not expect erythritol, a synthetic compound manufactured from an extensive chemical process, to be present in foods and beverages labeled "All Natural" and/or "100% Natural."

### The Products' So-Called "Natural Flavors" Render the Products Un-Natural

62.    In addition to all the unnatural, synthetic ingredients discussed *supra,* the so-called "natural flavors" in the Products further render the Products unnatural.[30]

63.    Notably, the FDA defines "natural flavor" as:

> [T]he essential oil, oleoresin, essence or extractive, protein hydrolysate, distillate, or any product of roasting, heating or enzymolysis, which contains the flavoring constituents derived from spice, fruit, or fruit juice, vegetable or vegetable juice, edible yeast, herb, bark, bud, root, leaf or similar plant material, meat, seafood, poultry, eggs, dairy products, or fermentation products thereof, whose significant function in food is flavoring rather than nutritional.

---

[30] To the extent it is not otherwise apparent, Plaintiff clarifies that Plaintiff is *not* alleging, or even implying, that the "natural flavors" label is somehow inaccurate.  Rather, Plaintiff is pointing out that the "natural flavors" in the Products contribute to the Products *not* being, "All Natural," or "100% Natural."  Plaintiff is *not* attempting to re-define "natural flavors" or otherwise place the term at issue. Plaintiff is *not* claiming Defendant's use of the term "natural flavors" is deceptive or misleading. Plaintiff is claiming only that the "All Natural" and "100% Natural" claims are false, misleading, unfair, and/or deceptive in light of multiple factors, including, but not limited to the inclusion of the so-called "natural flavors."

20 C.F.R. § 101.22

64.     Ingredients that qualify as a "natural flavor" often have constituent components which are artificial or synthetic, and may not qualify as "natural" ingredients. *See Lam v. General Mills, Inc.,* 859 F.Supp.2d 1097, 1102 (holding that a product with no natural ingredients can still qualify as "naturally flavored"). Many of the ingredients compatible with the FDA's definition of "natural flavors" are artificial or highly processed, despite being derived from natural ingredients. Consequently, something that is a "natural flavor" still might render a product "un-natural." Upon information and belief, that is the case here: the "natural flavors" present in the Products contain such artificial or synthetic ingredients as to render the Products' "All Natural" and/or "100% Natural" claims false.

65.     Indeed, flavor agents are chemical compounds that have a particular chemical structure. They are designed to create unique flavor sensations when consumed. Adding these ingredients alters the natural state of the Products. In fact, often the "natural flavors" ingredients are synthesized and undergo chemical processes to be able to produce the desired "natural" taste. However, even if the natural flavors are not synthesized, their extraction necessitates the use of various ingredients such as ethanol, propylene, glycor, glycerine, and others – which are then added to the "natural flavors."[31]

66.      In addition, "natural flavors" also frequently include other non-natural solvents and/or by-products which were used during the extraction of these flavors and synthesis.[32] While Defendant does not disclose its proprietary ingredient composition, extraction, or synthesis, other than indicating that "natural flavors" were added, this ingredient is not natural, even if it was not synthesized, due to its extraction, production/formulation, and the chemical residues it carries.[33]

67.     In light of the above, if fully informed, reasonable consumers would not expect the so-called "natural flavors" to be present in foods and beverages labeled "All Natural" and/or "100%

---

[31] Matthew Attokaran, <u>Natural Food Flavors and Colorants,</u> 31-34 (2d ed. 2017).
[32] *Id.*
[33] *Id.*

Natural." Consumers buying such a product expect to taste natural products and flavors, instead of altered synthetic and/or artificial ingredients added to change the taste to be more pleasing. For this reason, in addition to all of the above, the "All Natural" and/or "100% Natural" claim on the Products is false, misleading, unfair, and deceptive.

### *The Products' Claims Mislead Reasonable Consumers*

68.     There are market incentives for companies to label their products as "natural." According to a national representative survey, more than half of consumers look for products with a "natural" food label, often under "the false belief that they're produced without...artificial ingredients."[34] Therefore, the reasonable consumer will pay a price premium for products with an "All Natural" and/or "100% Natural" label because they believe these products are safer, more nutritious, or otherwise have different attributes than products that do not have the label, all things being equal. *Id.* These factors influenced Defendant to deceptively label their products as "All Natural" to give themselves a market advantage.

69.     Reasonable consumers do not expect a product prominently labeled as "All Natural" to contain multiple unnatural ingredients, including ascorbic acid, high fructose corn syrup, malic acid, erythritol, and added coloring (including but not limited to "beta carotene," "fruit and vegetable juices," "annatto," and "vegetable juice"). The Products' labels are deceptive and misleading in violation of the Missouri Merchandising Practice Act, and various other Missouri laws, as well as those of multiple other states.

70.     Reasonable consumers such as Plaintiff do not have specialized knowledge necessary to identify ingredients in the Products as being inconsistent with Defendant's advertised claim of being "All Natural" and/or "100% Natural."

71.     Defendant knows that consumers are willing to pay more for foods that are labeled "All

---

[34] Andrea Rock, "Peeling Back the 'Natural' Food Label." *Consumer Reports,* 27 January 2016. https://consumerreports.org/food-safety/peeling-back-the-natural-food-label/    (last visited April 1, 2022).

Natural" because they perceive it to be a healthier alternative to similar products without any added coloring, and advertises the Products with the intention that consumers rely on the representation made on the front of the Products' packaging made in all capital letters with prominent bold font "All Natural."

72.    Plaintiff and other consumers purchased the Products due to their belief that the Products are safer, more nutritious, or otherwise have different attributes than do products that do not have the "All Natural" or "100% Natural" labels.

73.    Plaintiff and the Class made their purchasing decisions in reliance upon Defendant's advertised claims that that Products are "All Natural" and/or "100% Natural."

74.    Plaintiff and the Class reasonably and detrimentally relied upon the Products' front labels indicating that the Products are "All Natural" and/or "100% Natural."

75.    Plaintiff and the Class would not have purchased the Products had they known that the Products contained ingredients that were added for coloring, thus rendering the Products no longer as being "All Natural" and/or "100% Natural."

76.    Defendant's conduct threatens Missouri and the other states' consumers by using false, deceptive, and misleading labels. Defendant's conduct also threatens other companies, large and small, who "play by the rules." Defendant's conduct stifles competition, has a negative impact on the marketplace, and reduces consumer choice.

77.    There is no practical reason for the false or misleading labeling and advertising of the Products, other than to mislead consumers as to the actual ingredients of the Products being purchased by consumers while simultaneously providing Defendant with a financial windfall because of money saved from lower supply costs.

### *Allegations Relating to All Plaintiffs*

78.    As noted, *supra,* since the initial offering of the Products, each and every container of the

21

Products has borne one or more uniformly-worded labels falsely claiming the Product is "All Natural" and/or "100% Natural" (hereinafter "False Claims").

79.    In reality, for all the reasons set forth supra, a reasonable consumer would find that the False Claims are false, misleading, unfair, and/or deceptive.

80.    Defendant, as developer, manufacturer, and exclusive seller and distributor of the Products, has been aware since the Products' inception, that the False Claims are in fact false.

81.    Indeed, Defendant undoubtedly did its own investigation of the Products and its marketplace prior to it being offered for sale and, of necessity, such investigation would have made Defendant aware that the False Claims are in fact false.

82.    Despite this, Defendants purposely made the False Claims in order to induce the false belief in consumers that they were purchasing a product that was indeed "All Natural" and/or "100% Natural."

83.    Plaintiff and the class members purchased the Products with being aware that the Products are not, in fact, "All Natural."

84.    Defendant possessed specialized knowledge regarding the data and information concerning the formula of the Products and its clams.

85.    In fact, in regard to the False Claims, the Product is a credence good because its purported "All Natural" label cannot be independently verified by the consumer at the time of purchase.

86.    In purchasing the Products, Plaintiff and the class members had no choice but to necessarily and justifiably rely upon the False Claims as accurate.

87.    Had Plaintiffs known that the False Claims were false, Plaintiffs would not have purchased the Product or would not have paid as much for the Products.

88.    If, at some point in the future, the Product was improved to actually be "All Natural," Plaintiff would then purchase the Products again.

22

89.    As the direct and proximate result of the False Claims, Plaintiff and the class members have suffered economic injury by being deprived of the benefit of the bargain they were promised by Defendant.

90.    By marketing, selling and distributing the Product to purchasers in Missouri, Defendant made actionable statements that the Products were not "All Natural," but at all times failed to disclose that the Product was not in fact "All Natural."

91.    Defendant engaged in the above-described actionable statements, omissions and concealments with knowledge that the representations were false and/or misleading, and with the intent that consumers rely upon such concealment, suppression and omissions.

92.    Alternatively, Defendant was reckless in not knowing that the False Claims were false and misleading at the time they were made.

93.    As the distributor, marketer, producer, manufacturer, and seller of the Products, Defendant possessed specialized knowledge regarding the data and information concerning the chemical formula of the Products which the Plaintiff and the class members could not and did not review.

94.    All of Plaintiffs' claims are based on misleading statements that violate FDA regulations. Such claims do not seek to impose any additional or different obligations beyond those already required by such FDA regulations.

*Facts Particular to Plaintiff Nicholas Brunts*

95.    On April 3, 2022, at approximately 10:07 a.m. (central time), Plaintiff purchased one of the Products – the Arizona "Mucho Mango" Fruit Juice Cocktail, 128 fl. oz., from the Walmart located at 2201 Michigan Ave., Arnold, Missouri, 63010 (St. Louis County). Plaintiff was charged exactly $2.96 for the Product, along with an additional $.19 for taxes, and paid a total of $3.15 for the Product.

96.    In addition, prior to the above purchase, Plaintiff had regularly purchased and/or ingested the Products for years.  Plaintiff recalls purchasing and ingesting a wide variety of the Products listed

herein, including, from time to time, the diet versions of the Products.

97.    Due to the claims on the packaging, Plaintiff falsely believed he was purchasing a product that was "All Natural."

98.    Plaintiff purchased the Product primarily for his personal, family and household use, and personally used the Product (by ingesting it).

99.    At the time he purchased the Product as described above, Plaintiff was unaware of the falsity of the Products' claims.

100.    He discovered that such claims were false shortly after purchasing and ingesting the Product in April.

101.    If Plaintiff had been aware of the falsity and misleading nature of Defendant's claims regarding the Product, he would not have bought the Product.

102.    When Plaintiff purchased the Product, he was injured by Defendant's illegally deceptive, false, and misleading conduct in marketing and selling the Product.

103.    Specifically, Plaintiff suffered an ascertainable loss because he did not receive the expected benefit of his bargain.

104.    When Plaintiff was purchasing the Product, due to the false claims upon the Product, Plaintiff believed that he was receiving a product that was, in fact, "All Natural."  The Product did not do what Plaintiff bargained for, however; because it was not all natural.

105.    The Product was not what it was purported to be.  Plaintiff did not receive the value of what he bargained for; instead Plaintiff received a product that did not live up to its most-prominently advertised benefit.

106.    Consequently, Plaintiff was damaged in the amount of the difference between the cost paid for the Product as represented – as one that was "All Natural," and the actual value of the products. Said difference would therefore be a percentage of the price paid for the Product.

107.    Although the aforementioned facts apply to named Plaintiff, for purposes of the proposed Class, all that is relevant is that Plaintiff and the class members or subclass members, Missouri citizens, or citizens of the Consumer Protection States, purchased the Product at a time within the Class Period while in Missouri and/or one of the Consumer Protection States.

## CAUSES OF ACTION

**COUNTS RELATING TO THE MISSOURI AND CONSUMER PROTECTION SUBCLASSES**

**COUNT ONE: BREACH OF WARRANTY**

108.    Plaintiff hereby incorporates by reference and re-alleges each allegation set forth in each preceding paragraph of this Class Action Petition.

109.    Defendant sold the Product in its regular course of business.  Plaintiff and the class members purchased the Product.

110.    Defendant made promises and representations in an express warranty provided to all consumers, namely the False Claims.

111.    The False Claims became the basis of the bargain between the Defendant and Plaintiff and each class member.

112.    Defendant gave these express warranties to Plaintiff and each class member in written form on the labels of the Product.

113.    Defendant's written affirmations of fact, promises, and/or descriptions as alleged are each a written warranty under Missouri law and the laws of the Consumer Protection States.

114.    Defendant breached the warranty because the False Claims were false.

115.    The False Claims were false when the sales took place and were undiscoverable to Plaintiff and the class members at the time of purchase.

116.    All conditions precedent to seeking liability under this claim for breach of express warranty have been performed by or on behalf of Plaintiff and the class in terms of paying for the

Product.

117.    Defendant had actual notice of the false labeling information and to date has taken no action to remedy its breach of express and implied warranty.

118.    Specifically, on April 4, 2022, counsel for Plaintiff provided written NOTICE of Defendant's breach of express warranty to Defendant.  Defendant has not meaningfully responded, and has taken no action to remedy its breach of express and implied warranty.

119.    In addition, Defendant previously knew or should have known of the falsity of the False Claims on the Product due to, inter alia, Defendant's testing and knowledge of the Product.

120.    Defendant has nonetheless refused to remedy such breaches.

121.    By placing the Product in the stream of commerce, and by operation of law and the facts alleged herein, Defendants also impliedly warrantied to Plaintiff and the class members that the Products were accurately labeled in conformance with the law.

122.    Defendant's breaches of warranty have caused Plaintiffs and class members to suffer injuries, paying for falsely labeled products, and entering into transactions they otherwise would not have entered into for the consideration paid.  As a direct and proximate result of Defendant's breaches of warranty, Plaintiff and class members have suffered damages and continue to suffer damages.

123.    As a result of Defendant's breach of these warranties, Plaintiff and class members are entitled to legal and equitable relief including damages, costs, attorneys' fees, rescission, and/or other relied as deemed appropriate, in an amount sufficient to compensate them for not receiving the benefit of their bargain.

## COUNT TWO: BREACH OF IMPLIED CONTRACT (IN THE ALTERNATIVE)

124.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

125.    By operation of law, there existed an implied contract for the sale of the Product between

Defendant and Plaintiff and each class member who purchased the Product.

126.    By operation of law, there existed an implied duty of good faith and fair dealing in each such contract.

127.    By the acts alleged herein, Defendant has violated that duty of good faith and fair dealing, thereby breaching the implied contract between Defendant and each class member.

128.    As a result of that breach, Plaintiff and each class member suffered damages.

## COUNT THREE: UNJUST ENRICHMENT

129.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

130.    Plaintiffs plead their claim for relief in the alternative to the contract claims set forth above.

131.    Plaintiff and the class members have conferred substantial benefits on Defendant by purchasing the Product, and Defendant has knowingly and willfully accepted and enjoyed those benefits.

132.    Defendant either knew or should have known that the payments rendered by Plaintiff and the class members were given and received with the expectation that the Product would be as represented and warranted.   For Defendant to retain the benefit of the payments under these circumstances is inequitable.

133.    Through deliberate misrepresentations or omissions in connection with the advertising, marketing, promotion, and sale of the Products, including the False Claims, Defendant reaped benefits, which result in Defendant wrongfully receiving profits.

134.    Equity demands disgorgement of Defendant's ill-gotten gains.   Defendant will be unjustly enriched unless Defendant is ordered to disgorge the unjustly obtained portion of profits for the benefit of Plaintiff and the class members.

135.    As a direct and proximate result of Defendant's wrongful conduct and unjust enrichment,

Plaintiffs and the class members are entitled to restitution from Defendant and institution of a constructive trust disgorging all profits, benefits, and other compensation obtained by Defendant through this inequitable conduct.

## COUNT FOUR: VIOLATION OF THE MMPA & OTHER CONSUMER PROTECTION LAWS

136.    Plaintiff hereby incorporates by reference and re-alleges each allegation set forth in each preceding paragraph of this First Amended Complaint, as though fully set forth herein.

137.    Defendant's acts complained of herein occurred in and emanated from the State of Missouri and/or one of the Consumer Protection States.

138.    Plaintiff and all members of the Class are "persons" and the Product is "merchandise" as those terms are defined under the MMPA.

139.    As set out in this Petition, Defendant's marketing of the Product constitutes deception, false pretense, misrepresentation, unfair practice, or, at a minimum, the concealment, suppression, or omission of a material fact in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. chap. 407 ("MMPA").

140.    As a result of Defendant's actions, consumers, including Plaintiff, were misled or deceived that the Product they were purchasing only used "Natural Flavors."

141.    Defendant's deceptive acts caused Plaintiff and the Class Members an ascertainable loss within the meaning of the MMPA.

142.    Due to Defendant's illegal conduct, Plaintiffs are entitled to restitution of all funds improperly obtained by Defendants.

143.    Plaintiffs have been forced to hire attorneys to enforce their rights under the MMPA.

144.    For all of the same reasons set forth above, Defendants' conduct also violates the materially-similar consumer protection laws of the Consumer Protection Subclass:

a.  Illinois:  815 ILCS § 501/1, *et. seq.*

b.  Maryland: Md. Code Ann. Com. Law, § 13-301, *et. seq.*

c.  Hawaii: Haw. Rev. Stat. § 480-2, *et. seq.*

d.  New York: N.Y. Gen. Bus. Law § 349, *et. seq.*

e.  Washington D.C.: D.C. Code § 28-3901, *et. seq.*

f.  Rhode Island: R.I. Gen. Laws § 6-13..1- 5.2(B), *et. seq.*

g.  Vermont: 9 V.S.A. § 2451, *et. seq.*

h.  Washington: Wash. Rev. Code § 19.86.010, *et. seq.*

i.  Connecticut: Conn. Gen. Stat. Ann. §§ 42-110, *et. seq.*

("Consumer Protection Statutes")

145.    Accordingly, just as the MMPA has been violated by Defendant as alleged herein, each of the above Consumer Protection Statutes, all materially-similar to the MMPA, have also been violated by Defendants.

146.    Each of these Statutes is materially similar to the MMPA. Each broadly prohibits deceptive conduct in connection with the sale of goods to consumers. No state requires proof of individualized reliance, or proof of Defendant's knowledge or intent. Instead, it is sufficient that the deceptive conduct is misleading to reasonable consumers and that the conduct proximately caused harm. Defendant's conduct violates each statute's shared prohibitions.

147.    Each of the Consumer Protection Statutes prohibits unfair, unconscionable, and/or deceptive acts or practices in the course of trade or commerce or in connection with the sales of goods or services to consumers.  Defendant's conduct violates each statute's prohibitions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for an order certifying this action as a Nationwide Class, Consumer Protection Subclass and/or Missouri Subclass class action, and appointing Plaintiff Nicholas

Brunts as Class and/or Subclass representative and his counsel as class and/or subclass counsel. Plaintiff requests that this court find that the Defendant is liable pursuant to the aforementioned nationwide common law claims; and/or violated the MMPA and/or the Consumer Protection Statutes, and award Plaintiffs compensatory damages, restitution, punitive damages, and attorneys' fees, and such further relief as the Court deems just, including injunctive relief.

Respectfully submitted,

**DANIEL F. HARVATH, ESQ.**

By: /s/ *Daniel F. Harvath*
Daniel F. Harvath, #57599MO
**HARVATH LAW GROUP, LLC**
75 W. Lockwood, Suite #1
Webster Groves, MO 63119
(314) 550-3717
dharvath@harvathlawgroup.com
*Attorney for Plaintiff*

## **CERTIFICATE OF SERVICE**

The Undersigned hereby certifies that the foregoing document was served upon all counsel of record automatically by the Court's CM/ECF system.

/s/  Daniel F. Harvath            .