## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| **NICHOLAS BRUNTS,** *individually and on behalf of all others similarly situated,* | ) ) ) ) |
| **Plaintiff,** | ) ) |
| **v.** | ) **Case No. 4:22CV648 HEA** ) |
| **HORNELL BREWING CO., INC.,** et al., | ) ) ) |
| **Defendants.** | ) |

## AMENDED OPINION, MEMORANDUM AND ORDER

This matter is before the Court on Defendant Hornell Brewing Co., Inc.'s

Motion for Judgment on the Pleadings, [Doc. No. 57]. Plaintiff opposes the

motion.  For the reasons set forth below, the Defendant's Motion will be granted.

### Facts and Background

On April 8, 2022, Plaintiff filed this putative class action proceeding against

Defendants in the Circuit Court of St. Louis County, Missouri, alleging breach of

warranty, breach of implied contract, unjust enrichment, and violations of the

Missouri Merchandising Practices Act. Plaintiff asserts that Defendants sold a

variety of AriZona beverages, falsely representing that the products were "All

Natural" or "100% Natural" when the beverages contained added coloring and unnatural ingredients.

Defendant Hornell Brewing timely removed the matter to federal court, invoking this Court's diversity jurisdiction under the Class Action Fairness Act of 2005 (CAFA), 28 U.S.C. § 1332(d). Plaintiff filed a motion to remand this case back to the Circuit Court of St. Louis County, Missouri, which was denied.

On August 31, 2022, Plaintiff filed an Amended Complaint [Doc. No. 22] . Defendant filed a Motion to Dismiss, which was granted in part and denied in part [Doc. No. 36]. Plaintiff filed his Second Amended Complaint [Doc. No. 41] on June 6, 2023 and his Third Amended Complaint [Doc. No 55] on August 16, 2023.

Plaintiff's Third Amended Complaint alleges, in pertinent part:[1]

Defendant falsely labels and advertises certain AriZona beverage products as being "All Natural," when, in reality, they contain multiple ingredients that are not natural. Hornell and AriZona manufacture, distribute, and/or sell the Products. The purportedly "All Natural" AriZona beverages are collectively referred to as the "Products," which include the following AriZona beverages: Kiwi Strawberry

---

[1] For purposes of deciding the motion to dismiss for failure to state a claim, the Court accepts the factual allegations contained in the Amended Complaint as true. *Eckert v. Titan Tire Corp.* 514 F.3d 801, 806 (8th Cir. 2008). The Court may also consider documents attached to, or materials that are necessarily embraced by, the pleadings. *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999) (internal quotations and citations omitted). This recitation of facts, however, is set forth for the purposes of this motion only and in no way relieves the parties of the necessary proof thereof in later proceedings.

Fruit Juice Cocktail, Lemonade Fruit Juice Cocktail, Mucho Mango Fruit Juice

Cocktail, Fruit Punch Fruit Juice Cocktail, Watermelon Fruit Juice Cocktail;

Orangeade, Grapeade, Lemonade Drink Mix, Golden Bear Strawberry Lemonade,

Diet Peach Iced Tea, and Rx Energy Herbal Tonic product, all of which

Defendants label as being "All Natural" and/or "100 Natural. The Products,

regardless of flavor or color of packaging, uniformly claim to be "ALL

NATURAL." The "ALL NATURAL" label is a key selling point for the Products.

By representing the Products to be "All Natural," Defendant is capitalizing

on consumers' preference for food items with no artificial additives. In reality,

however, the Products cannot be labeled as "All Natural" because they contain

multiple unnatural ingredients, including ascorbic acid, high fructose corn syrup,

malic acid, erythritol, and added coloring (including but not limited to "beta

carotene," "fruit and vegetable juices," "annatto," and "vegetable juice").

The average consumer spends less than 20 seconds making any individual

in-store purchasing decision. That decision hinges almost entirely on the product's

front labeling because the average consumer does not have the time – while

presumably on a schedule and surrounded by multiple other consumers – to inspect

the small font on the rear of a Product to determine whether it tends to support

and/or refute a prominent claim, such as "All Natural," on the front of the Product.

Based on the "All Natural" and/or "100% Natural" claims on the front of the Product, a reasonable consumer would believe that the Product contains only "natural" ingredients. Likewise, consumers assume that a "natural" product will not contain any preservatives. This is true despite what ingredients may be listed on the back-side small-print of a product. Consumers' ability to interpret nutrition label information on the back of products is relatively poor; thus, the prominent labels typically featured on the front packaging are particularly important to a consumer's purchasing decision.

Consequently, Defendants' practice of capitalizing on consumers' preferences for healthier products by falsely labeling their Products "All Natural" and/or "100% Natural" is deceptive and misleading. This deception continues today, as consumers continue to purchase the Products under the mistaken belief that they are all natural based on Defendant's false, deceptive, and misleading label claims of "All Natural" and/or "100% Natural."

Plaintiff and other consumer of the Products made their purchase decisions in reliance upon Defendants' advertised claims that the Products are "All Natural."

By falsely labeling the Products as being "All Natural," Defendant Hornell has profited from consumers' preference for food products that are perceived to be healthier and made free from any unnatural ingredients, preservatives, and/or added coloring.

The "All Natural" and/or "100% Natural" claims are false because the
Products contain multiple unnatural ingredients and/or preservative – either
ascorbic acid, high fructose corn syrup, malic acid, or erythritol, as well as
unnatural added coloring – including but not limited to "beta carotene,"
"fruit and vegetable juices," "annatto," and "vegetable juice." In addition to the
above-listed unnatural ingredients and preservatives in the Products
(discussed infra), the added coloring in each of the Products renders the "All
Natural" claims false.

The Food and Drug Administration ("FDA") does not regard foods with
added coloring as natural, no matter the source of the coloring agent. According to
their guidelines, they "have considered 'natural' to mean that nothing artificial or
synthetic (including colors regardless of source) is included in, or has been added
to, the product that would not normally be expected to be there (56 FR 60421 at
60466).

In response to citizen petitions and consumer requests, the FDA recently
announced the establishment of a docket to receive information and comments on
the use of the term "natural" in the labeling of human food products to determine
whether a definition of "natural" should be established.

Among the 7,687 public comments received by the FDA, not one comment
from the public stated that "natural" should be allowed in food labeling if color is

added to a food; rather, hundreds of comments stated "natural" should only be used for foods which are free from added coloring. In addition, multiple comments discussed the other various unnatural ingredients in the Products. Some representative examples include:

a.   "When I see the word 'Natural' on packaging, I expect the contents to have only ingredients as they are found in nature. No chemicals, no coloring, no flavoring, no GMO's." (Comment from Kristine Milochik. Posted 02/23/2016).

b. "I think the term 'Natural' should be banned from food labeling. It is too ambiguous! It should be removed from all descriptors, including: Natural Flavor, Natural colors, All Natural and so on. I think for the interest of transparency all food ingredients should be simply labeled. The consumer has the right to know what they are eating or drinking." (Comment from Daniel Kinkelaar. Posted 08/26/2016).

c. "I firmly believe that consumers should be made aware of what they are purchasing when shopping for food and too many times companies are fooling the public by using the word 'Natural' when in fact it is not. When I see the word Natural on a food product, I consider this to mean that it is free from all additives, GMOs, Preservatives, Drugs, or colors. It is in its natural state. I would like to see the FDA put more stringent requirements on companies who wish to use this term in their products." (Comment from Artemis Hader.

Posted on 02/18/2016)

    d. "The term 'Natural' should only appear on foods that are organic without any preservatives or man-made chemicals. The food should be GMO-free and contain no added colors, flavors, or synthetic substances. If a food product fails to meet any of these requirements, then it should not be allowed to have the label 'Natural' on it." (Comment from Sara Burr. Posted on 03/16/2016)

    e. "Natural should indeed mean no preservatives, additives, GMO's and or flavor or color enhancers..." (Comment from Roy Collicutt. Posted on 03/15/2016).

    f. "Natural should mean no added colors, flavoring, or preservatives, including citric acid. Natural should mean minimally processed and GMO free." (Comment from Catherine Willick. Posted on 02/16/2016).

    g. "Natural should be used only when no artificial/synthetic flavors or colorings or preservatives have been used. Natural should never be used for any product containing geneticall[y] engineered ingredients, including ascorbic acid, folic acid, or anything other GE mineral/supplementation. (Comment from Kathryn Mahony. Posted on 05/05/2015).

    h. "Ascorbic acid may or may not be natural, depending on the source and should be labeled that way." (Comment from James Scott. Posted on 12/16/2015).

    i. "Natural should mean no genetically modified ingredients, no hormones or

antibiotics, no high fructose corn syrup, and no preservatives or additives. (Comment from Steven Malafy. Posted on 12/27/2015).

j. "No highly processed/artificial sweeteners or sugar substitutes [such as] . . . erythritol." (Comment from Kristen Behrens. Posted on 10/18/2016).

k. "Food additives Maltodextrin and Natural flavors are used to enhance and preserve the products' flavors and appearance. These two additives should not be considered natural because it alters the food changing it from its original state." (Comment from Absydee Molina. Posted on 10/26/2016).

Clearly, reasonable consumers do not expect ingredients such as added colors, ascorbic acid, high fructose corn syrup, malic acid, erythritol or any of the various "natural flavors" to be present in products labeled "All Natural" or "100% Natural." Moreover, in that each of the Products contains at least one other unnatural ingredient and/or preservative in addition to the Product's "natural flavors," it can be fairly said that each Product contains multiple ingredients a reasonable consumer would not find to be "natural." To date, the FDA has not announced its decision to further define or regulate the term "natural" in food labeling. The "All Natural" or "100% Natural" label is prominently and conspicuously printed on the front of the Products. However, the added coloring agents coloring agents (regardless of their source), ascorbic acid, high fructose corn syrup, malic acid, and erythritol, are not ingredients consumers would

8

normally expect to be included in products that are labeled as "All Natural." Consequently, those ingredients render the "All Natural" and "100% Natural" claims false, misleading, and deceptive.

The FDA does not regard foods with added coloring as natural, no matter the source of the coloring agent. According to their guidelines, they "have considered 'natural' to mean that nothing artificial or synthetic (including colors regardless of source) is included in, or has been added to, the product that would not normally be expected to be there (56 FR 60421 at 60466)." Thus, if a product contains any color additives (as do all the Products) it cannot be truthfully labeled as "natural." Furthermore, the process by which naturally-sourced food coloring is added to products alters their status, rendering them no longer "natural," but artificial and/or synthetic. The specific food coloring agents in the Products are "vegetable juice," "fruit and vegetable juices," "annatto," and "beta carotene."

Annatto extract is extracted from the seeds of the Bixa Orellana tree. The extraction process involves the use of solvents such as methanol, ethanol, 2-propanol, acetane, ethyle acetate, and hexane. Residues of these solvents remain present in the finished annatto extract product, and make their way into the foods and beverages that use annatto extract as ingredients. This method of extraction,

coupled with the residual solvents present in annatto extract, makes it an artificial and synthetic ingredient, and renders any "All Natural" or "100% Natural" claims false.

Reasonable consumers would not expect annatto extract, a compound extracted with chemical solvents such as methanol and ethanol, to be present in foods and beverages labeled "All Natural" and/or "100% Natural." Likewise, beta carotene used for commercial purposes, such as food additives, is often chemically produced, rather than naturally harvested, to save costs. Beta carotene is synthesized using two main complex chemical processes, Wittig reactions and Grignard compounds.

According to the most-recent scientific journals on the subject, such as Frontiers in Bioengineering And Biotechnology, approximately 98% of commercial beta carotene is synthesized. Specifically, scientists report that "98% of all commercial ß-carotene was produced either using physiochemical synthesis or chemical synthesis, whilst the remaining 2% had biological origin." In light of the overwhelming probability (over 98%), and upon information and belief, the beta carotene in the Products is artificially synthesized, rather than being naturally harvested. This is made especially apparent by the relatively cheap price of some of the Products, which makes it even more likely that Defendants use synthesized

beta carotene. Consequently, the presence of beta carotene in the Products renders them unnatural.

Defendant misleadingly fails to state which particular "vegetable" and "fruit" juices are used for coloring; however, just as with beta carotene, the commercial extractions of these ingredients from vegetables and fruits makes these ingredients artificial and/or synthetic. These processed ingredients are added to the Products to change the composition of the product from its natural state, in an amount, type, and/or form which a reasonable consumer would not expect. Indeed, as stated above, the FDA specifically and expressly does not recognize food that contains these ingredients as "natural," and neither do consumers. Reasonable consumers do not expect a product prominently labeled as "All Natural," and/or "100% Natural" to have added coloring, regardless of source, to alter the color of the Products.

In addition to all the unnatural, synthetic ingredients discussed *supra*, the so-called "natural flavors" in the Products further render the Products unnatural. Notably, the FDA defines "natural flavor" as:

> [T]he essential oil, oleoresin, essence or extractive, protein hydrolysate, distillate, or any product of roasting, heating or enzymolysis, which contains the flavoring constituents derived from spice, fruit, or fruit juice, vegetable or vegetable juice, edible yeast, herb, bark, bud, root, leaf or similar plant material, meat, seafood, poultry, eggs, dairy products, or fermentation products thereof, whose significant function in food is flavoring rather than nutritional.

20 C.F.R. § 101.22

Ingredients that qualify as a "natural flavor" often have constituent components which are artificial or synthetic and may not qualify as "natural" ingredients. *See Lam v. General Mills, Inc*., 859 F.Supp.2d 1097, 1102 (holding that a product with no natural ingredients can still qualify as "naturally flavored"). Many of the ingredients compatible with the FDA's definition of "natural flavors" are artificial or highly processed, despite being derived from natural ingredients. Consequently, something that is a "natural flavor" still might render a product "unnatural." Upon information and belief, that is the case here: the "natural flavors" present in the Products contain such artificial or synthetic ingredients as to render the Products' "All Natural" and/or "100% Natural" claims false.

Indeed, flavor agents are chemical compounds that have a particular chemical structure. They are designed to create unique flavor sensations when consumed. Adding these ingredients alters the natural state of the Products. In fact, often the "natural flavors" ingredients are synthesized and undergo chemical processes to be able to produce the desired "natural" taste. However, even if the natural flavors are not synthesized, their extraction necessitates the use of various ingredients such as ethanol, propylene, glycor, glycerine, and others – which are then added to the "natural flavors." In addition, "natural flavors" also frequently include other non-natural solvents and/or by-products which were used during the

extraction of these flavors and synthesis. While Defendant does not disclose its proprietary ingredient composition, extraction, or synthesis, other than indicating that "natural flavors" were added, this ingredient is not natural, even if it was not synthesized, due to its extraction, production/formulation, and the chemical residues it carries.

In light of the above, if fully informed, reasonable consumers would not expect the so- called "natural flavors" to be present in foods and beverages labeled "All Natural" and/or "100% Natural." Consumers buying such a product expect to taste natural products and flavors, instead of altered synthetic and/or artificial ingredients added to change the taste to be more pleasing. For this reason, in addition to all of the above, the "All Natural" and/or "100% Natural" claim on the Products is false, misleading, unfair, and deceptive.

There are market incentives for companies to label their products as "natural." According to a national representative survey, more than half of consumers look for products with a "natural" food label, often under "the false belief that they're produced without...artificial ingredients." Therefore, the reasonable consumer will pay a price premium for products with an "All Natural" and/or "100% Natural" label because they believe these products are safer, more nutritious, or otherwise have different attributes than products that do not have the

label, all things being equal. These factors influenced Defendants to deceptively label their products as "All Natural" to give themselves a market advantage.

Reasonable consumers do not expect a product prominently labeled as "All Natural" to contain multiple unnatural ingredients, including ascorbic acid, high fructose corn syrup, malic acid, erythritol, and added coloring (including but not limited to "beta carotene," "fruit and vegetable juices," "annatto," and "vegetable juice"). The Products' labels are deceptive and misleading in violation of the Missouri Merchandising Practice Act, and various other Missouri laws, as well as those of multiple other states.

Reasonable consumers such as Plaintiff do not have specialized knowledge necessary to identify ingredients in the Products as being inconsistent with Defendants' advertised claim of being "All Natural" and/or "100% Natural." Defendants know that consumers are willing to pay more for foods that are labeled "All Natural" because they perceive it to be a healthier alternative to similar products without any added coloring and advertise the Products with the intention that consumers rely on the representation made on the front of the Products' packaging made in all capital letters with prominent bold font "All Natural."

Plaintiff and other consumers purchased the Products due to their belief that the Products are safer, more nutritious, or otherwise have different attributes than do products that do not have the "All Natural" or "100% Natural" labels.

Plaintiff and the Class made their purchasing decisions in reliance upon Defendants' advertised claims that that Products are "All Natural" and/or "100% Natural." Plaintiff and the Class reasonably and detrimentally relied upon the Products' front labels indicating that the Products are "All Natural" and/or "100% Natural." Plaintiff and the Class would not have purchased the Products had they known that the Products contained ingredients that were added for coloring, thus rendering the Products no longer as being "All Natural" and/or "100% Natural."

Defendants' conduct threatens Missouri and the other states' consumers by using false, deceptive, and misleading labels. Defendants' conduct also threatens other companies, large and small, who "play by the rules." Defendants' conduct stifles competition, has a negative impact on the marketplace, and reduces consumer choice. There is no practical reason for the false or misleading labeling and advertising of the Products, other than to mislead consumers as to the actual ingredients of the Products being purchased by consumers while simultaneously providing Defendants with a financial windfall because of money saved from lower supply costs.

As noted, supra, since the initial offering of the Products, each and every container of the Products has borne one or more uniformly-worded labels falsely claiming the Product is "All Natural" and/or "100% Natural" (hereinafter "False

Claims"). In reality, for all the reasons set forth supra, a reasonable consumer would find that the False Claims are false, misleading, unfair, and/or deceptive.

Defendant, as developer, manufacturer, and exclusive seller and distributor of the Products, has been aware since the Products' inception, that the False Claims are in fact false. Indeed, Defendant undoubtedly did its own investigation of the Products and its marketplace prior to it being offered for sale and, of necessity, such investigation would have made Defendant aware that the False Claims are in fact false. Despite this, Defendants purposely made the False Claims in order to induce the false belief in consumers that they were purchasing a product that was indeed "All Natural" and/or "100% Natural." Plaintiff and the class members purchased the Products without being aware that the Products are not, in fact, "All Natural." Defendant possessed specialized knowledge regarding the data and information concerning the formula of the Products and its clams. In fact, in regard to the False Claims, the Product's "All Natural" label cannot be independently verified by the consumer at the time of purchase. In purchasing the Products, Plaintiff and the class members had no choice but to necessarily and justifiably rely upon the False Claims as accurate. Had Plaintiffs known that the False Claims were false, Plaintiffs would not have purchased the Product or would not have paid as much for the Products. Plaintiff and class members desire and will purchase the

Products again in the future, but will not be able to discern whether the "All Natural" or "100% Natural" label claims are truthful.

As the direct and proximate result of the False Claims, Plaintiff and the class members have suffered economic injury by being deprived of the benefit of the bargain they were promised by Defendant. By marketing, selling, and distributing the Product to purchasers in Missouri, Defendant made actionable statements that the Products were not "All Natural," but at all times failed to disclose that the Product was not in fact "All Natural." Defendant engaged in the above-described actionable statements, omissions, and concealments with knowledge that the representations were false and/or misleading, and with the intent that consumers rely upon such concealment, suppression, and omissions. Alternatively, Defendant was reckless in not knowing that the False Claims were false and misleading at the time they were made. As the distributor, marketer, producer, manufacturer, and seller of the Products, Defendant possessed specialized knowledge regarding the data and information concerning the chemical formula of the Products which the Plaintiff and the class members could not and did not review. All of Plaintiffs' claims are based on misleading statements that violate FDA regulations. Such claims do not seek to impose any additional or different obligations beyond those already required by such FDA regulations.

17

On April 3, 2022, at approximately 10:07 a.m. (central time), Plaintiff purchased one of the Products – the Arizona "Mucho Mango" Fruit Juice Cocktail, 128 fl. oz., from the Walmart located at 2201 Michigan Ave., Arnold, Missouri, 63010 (St. Louis County). Plaintiff was charged exactly $2.96 for the Product, along with an additional $.19 for taxes, and paid a total of $3.15 for the Product. In addition, prior to the above purchase, Plaintiff had regularly purchased and/or ingested the Products for years. Plaintiff recalls purchasing and ingesting a wide variety of the Products listed herein, including, from time to time, the diet versions of the Products. Due to the claims on the packaging, Plaintiff falsely believed he was purchasing a product that was "All Natural."

Plaintiff purchased the Product primarily for his personal, family and household use, and personally used the Product (by ingesting it). At the time he purchased the Product as described above, Plaintiff was unaware of the falsity of the Products' claims. He discovered that such claims were false shortly after purchasing and ingesting the Product in April. If Plaintiff had been aware of the falsity and misleading nature of Defendant's claims regarding the Product, he would not have bought the Product or would not have paid as much for the Product. Plaintiff continues to see the Products available for purchase. Plaintiff desires to and will purchase the Products again in the future but will not be able to discern whether the "All Natural" or "100% Natural" label claims are truthful.

18

Plaintiff does not personally know what ingredients are actually contained in the Products or the methods used to make the Products (including sourcing and manufacturing processes), and Plaintiff does not possess any specialized knowledge or general familiarity with the Products' ingredients or the methods typically used to obtain or make such ingredients (including sourcing and manufacturing processes), such that Plaintiff does not personally know and cannot determine whether the Products' ingredients: (a) are naturally harvested or artificially created or synthesized, or (b) have undergone substantial processing that has materially altered the ingredients' original natural composition; and, therefore, Plaintiff has no way of determining whether the "All Natural" representations on the Products are true.

When Plaintiff purchased the Product, he was injured by Defendants' illegally deceptive, false, and misleading conduct in marketing and selling the Product. Specifically, Plaintiff suffered an ascertainable loss because he did not receive the expected benefit of his bargain. When Plaintiff was purchasing the Product, due to the false claims upon the Product, Plaintiff believed that he was receiving a product that was, in fact, "All Natural." The Product did not do what Plaintiff bargained for, however, because it was not all natural. The Product was not what it was purported to be. Plaintiff did not receive the value of what he bargained for; instead, Plaintiff received a product that did not live up to its most-

prominently advertised benefit. Consequently, Plaintiff was damaged in the amount of the difference between the cost paid for the Product as represented – as one that was "All Natural," and the actual value of the products. Said difference would therefore be a percentage of the price paid for the Product.

Plaintiff seeks compensatory damages, restitution, attorney's fees, rescission, and "such further relief as the Court deems just, including injunctive relief," and "all profits, benefits, and other compensation obtained by Defendant through [the] inequitable conduct," on behalf of a putative class of Missouri citizens who purchased the Products over a five-year period in Missouri.

## Legal Standards

"Judgment on the pleadings is appropriate where no material issue of fact remains to be resolved and the movant is entitled to judgment as a matter of law." *Lansing v. Wells Fargo Bank, N.A.*, 894 F.3d 967, 971 (8th Cir. 2018) (citation omitted). Ultimately, a motion for judgment on the pleadings is governed by the same standard as a motion to dismiss under Fed. R. Civ. P. 12(b)(6). See *Clemons v. Crawford, 585 F.3d 1119, 1124* (8th Cir. 2009). In deciding a motion for judgment on the pleadings under Fed. R. Civ. P. 12(c), the Court "accept[s] all facts pled by the nonmoving party as true and draw[s] all reasonable inferences from the facts in favor of the nonmovant." *Waldron v. Boeing Co*., 388 F.3d 591, 593 (8th Cir. 2004) (citations omitted). Although the factual allegations need not

be detailed, they must be sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). The complaint must "state a claim to relief that is plausible on its face." *Id*. at 570.

**Injunctive Relief**

In its Opinion dated May 19, 2023, the Court granted Defendants' Motion to Dismiss as to injunctive relief. In an effort to avoid the effect of this ruling, Plaintiff now contends he has stated a future injury in fact because his TAC alleges that he desires to purchase and will purchase the products again in the future but will not be able to discern whether the "all Natural" or "100% Natural" label claims are truthful.  He asserts that since he is a consumer who is not sophisticated in the manufacturing processes of various beverages or formulations of Defendants' products, including specific artificial and/or synthetic ingredients added to the products, he will be unable to ascertain whether Defendants have fixed the products, believing they are no longer falsely advertised.

Plaintiff's attempt to establish a future concrete injury fails. The very ingredients Plaintiff claims are indeed artificial will preclude Plaintiff's belief that Defendant has "fixed" the products. Plaintiff is aware the product allegedly contains artificial ingredients, the ingredients which are clearly listed on the packaging. While Plaintiff may  or may not have reasonably relied on the front labels claims of "all natural" and "100% Natural" for his *initial* purchase, he can

no longer reasonably rely on the front labels since he now has knowledge of

ingredients he argues are not in fact "all natural."

> Despite plaintiff's say so, this amended pleading does not show how he will personally suffer an economic injury absent injunctive relief… [P]laintiff [is not] at risk of defendant allegedly misleading plaintiff again through deceptive packaging because he pleads that he will not buy another wheel unless there is an expiration date on it. His past exposure to potentially illegal conduct does not justify injunctive relief because he cannot show any continuing, present adverse effects. *Park v. Forest Serv. of U.S.*, 205 F.3d 1034, 1037 (8th Cir. 2000) (quoting O'Shea v. Littleton, 414 U.S. 488, 495–96 (1974)).
>
> Plaintiff fails to meet the standing requirements as laid out by *Park* and other cases. As previously explained, "[p]laintiff can no longer claim to be misled by defendant's omission of an expiration date because he now knows of the product defects he complains of and can elect to not buy the product. In other words, plaintiff's knowledge of the misrepresentation precludes his reliance on the misrepresentation, thus there is no cause of action, much less an Article III injury." Even if plaintiff were to buy another of defendant's wheels, he would make his purchase fully informed of the risks associated with the wheels, and he would, as a reasonable consumer, factor those risks into his purchasing decision, thereby receiving the full "benefit of the bargain" of his purchase. In short, plaintiff's pleading is devoid of any impending personal economic injury from defendant's ongoing sale of the wheels as they are.

*May v. Makita U.S.A., Inc.*, No. 1:22-CV-79-SNLJ, 2023 WL 3619354, at *3–4

(E.D. Mo. May 24, 2023). Defendant is entitled to judgment on the pleadings on

Plaintiff's claim for injunctive relief.

**Allegations of Fraud**

Defendant argues that Plaintiff fails to plead fraud claims with particularity

with respect to unidentified advertisements, marketing statements, website

communications, and social media platforms, as well as products containing preservatives, as required pursuant to Rule 9(b) of the Federal Rules of Civil Procedure. The Court, in its May 19, 2023 Opinion agreed Plaintiff's fraud claims were not pled with the requisite particularity. Defendant now argues Plaintiff's TAC fails to contain particularized facts to set forth fraud claims concerning the above stated claims.

Plaintiff does not dispute the TAC does not set forth particularized facts to set forth fraud claims, rather, he argues that his "primary allegation" about false labels is sufficient to set forth these fraud claims. Plaintiff relies on *Moore v. Compass Grp. USA, Inc*., No. 4:18-CV-01962-SEP, 2022 WL 4598558, at *8 (E.D. Mo. Sept. 30, 2022) as authority. Plaintiff's reliance on *Moore*, however, does not alleviate the requirement of pleading all claims alleging fraud with particularity.

> Here, Plaintiffs' claims are grounded in fraud, as they are all based on the primary allegation that Defendant's labeling practices are "misleading… Although many of Plaintiffs' claims are brought under various state consumer protection statutes, rather than common law actions for fraud, federal courts routinely apply Rule 9(b) to such statutory claims. See, e.g., *Goldman*, 501 F. Supp. 3d at 666 ("The Eastern and Western Districts of Missouri have consistently held that Rule 9(b) applies to MMPA cases."); *Camasta v. Jos. A. Bank Clothiers, Inc*., 761 F.3d 732, 736-37 (7th Cir. 2014) (analyzing ICFA claim under Rule 9(b)); *Kearns v. Ford Motor Co*., 567 F.3d 1120, 1125 (9th Cir. 2009) (applying Rule 9(b) to CLRA and UCL claims based on "unfair or deceptive acts"); *Pierce v. N. Dallas Honey Co*., 2020 WL 1047903, at *4 (N.D. Tex. Mar. 3, 2020) (applying Rule 9(b) to a Texas DTPA claim based on alleged misrepresentations and fraudulent concealment). And "[i]t is well-settled that the Federal Rules of Civil

Procedure apply in federal court, 'irrespective of the source of subject matter jurisdiction, and irrespective of whether the substantive law at issue is state or federal." *Kearns*, 567 F.3d at 1125 (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1102 (9th Cir. 2003) (citing *Hanna v. Plumer*, 380 U.S. 460 (1965))). "While a federal court will examine state law to determine whether the elements of fraud have been pled sufficiently to state a cause of action, the Rule 9(b) requirement that the circumstances of the fraud must be stated with particularity is a federally imposed rule." *Kearns*, 567 F.3d at 1125 (quoting *Vess*, 317 F.3d at 1103 (quoting *Hayduk v. Lanna, 775 F.2d 441, 443 (1st Cir. 1985)))* (cleaned up).

To satisfy Rule 9(b), "the complaint must plead such facts as the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result." *U.S. ex rel. Joshi v. St. Luke's Hosp., Inc*., 441 F.3d 552, 556 (8th Cir. 2006). In essence, a plaintiff must plead the "who, what, where, when, and how" of the circumstances constituting fraud. *Ascente Bus. Consulting, LLC v. DR myCommerce*, 9 F.4th 839, 845 (8th Cir. 2021) (citations omitted).

*Moore v. Compass Grp. USA, Inc*., No. 4:18-CV-01962-SEP, 2022 WL 4598558, at *8–9 (E.D. Mo. Sept. 30, 2022). Clearly, *Moore* does not stand for the proposition that a plaintiff may merely allege a "primary" allegation of fraud to satisfy Rule 9(b).

**Substantially Similar Products**

Defendants argue Plaintiff has failed to plead with particularity claims for "substantially similar" products. Plaintiff claims the allegations made regarding Mucho Mango are sufficient to carry over to his fraud claims for "substantially similar products."

24

The Court agrees that for *standing* purposes, Plaintiff may bring claims for unpurchased "substantially similar" products. District courts within Missouri are split as to whether a plaintiff may assert claims on behalf of a class that relate to products the named plaintiff did not personally purchase. In *Kelly*, the plaintiff sought to represent consumers who had purchased 16 varieties of potato chips. 81 F. Supp. 3d at 763. Finding the plaintiff "was neither personally nor actually harmed as to those twelve varieties," the district court limited the plaintiff's claims on standing grounds to the four varieties she had purchased. *Id*. Other courts have reached similar conclusions. See, e.g., *Drew v. Lance Camper Mfg. Corp*., No. 3:21-CV-5066, 2021 WL 5441512, at *7 (W.D. Mo. Nov. 19, 2021) (plaintiff does not have standing to assert claims with respect to products the plaintiff did not himself purchase); *Smith v. Atkins Nutritionals, Inc.,* No. 2:18-CV-4004, 2018 WL 9868591, at *7 (W.D. Mo. May 8, 2018) (same).

Not all courts, however, are so rigid. *Lizama v. Venus Lab'ys, Inc*., No. 4:22-CV-841 RLW, 2023 WL 4198097 (E.D. Mo. June 27, 2023). Courts applying the "substantially similar" test find that the "overarching question" for standing is whether the named plaintiff's injury is substantially similar to "the claims of those [he] seeks to represent." *Browning v. Anheuser-Busch, LLC*, 539 F. Supp. 3d 965, 977 (W.D. Mo. 2021) (cleaned up). Applying this test, courts consider whether the

25

products at issue and the "operative facts that give rise to the putative class representative['s] and the putative class's claims" are similar. *Id*. (cleaned up).

In *Goldman v. Tapestry, Inc*., 501 F. Supp. 3d 662, 667 (E.D. Mo. 2020), for example, the plaintiff challenged the discount pricing practices at an outlet store. The defendant argued, based on standing, that as a matter of law the plaintiff's claims should be limited to the nine items she actually purchased. The district court did not agree. The district court noted that the plaintiff was alleging she was harmed by the defendant's discount pricing scheme, not the products themselves. *Id*. at 667. The district court found that the pricing scheme applied to products the plaintiff purchased, as well as to those she did not purchase but which members of the proposed putative class had. The district court concluded the plaintiff had standing to assert claims on behalf of a class as to products she did not purchase, "as long as the products and alleged misrepresentations are substantially similar." *Id.* (quotation and citations omitted).

Analysis of whether Plaintiff has standing is quite different from the pleading requirements of Rule 9(b). Each claim of fraud must be pled with particularity. Plaintiff's claims with regard to "substantially similar" products fail to do so. Defendants' motion for judgment on the pleadings regarding substantially similar products will be granted.

**Unjust Enrichment, Breach of Warranty, and Implied Contract Claims**

Plaintiff argues his unjust enrichment, breach of warranty, and implied contract claims have been sufficiently pled. For the reasons discussed, *supra*, these claims are likewise insufficiently pled pursuant to Rule 9(b). Judgment on the pleadings will be entered in favor of Defendants.

**Conclusion**

Based upon the foregoing analysis, Defendant's Motion to Dismiss will be granted in part and denied in part.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Partial Judgment on the Pleadings, [Doc. No. 57] is granted.

**IT IS FURTHER ORDERED** that Plaintiff's request to amend contained in his Response is denied as not properly before the Court.

**IT IS FURTHER ORDERED** that Judgment on these claims will be entered upon the resolution of the remaining claims herein.

Dated this 29th day of March 2024.


_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE